Putnam J. dissented.
Afterwards the Court, upon the application of the counsel for the government, consented to hear a second argument upon the question.
Webster insisted, that the assent proposed to be obtained from the prisoner was not in the nature of a confession, within the rules of law admitting and excluding confessions. The principle is, that a man confesses what he is entitled to withhold ; he reveals a secret within his own breast, which he has a right to retain ; and as he- gives up some .king which the pub *511 Ac is not entitled to, the gift is to be free and voluntary, like other donations. Here the prisoner gives up nothing. Joseph has full power to make a confession, whether Francis assents or dissents. Francis was not asked for any confession. There is no evidence that he knew what Joseph would disclose, or that the disclosures would implicate himself. It is no confession criminating himself, to say that another person accused may make the best terms he can with the government. A confession is something that can be used against the defendant; this assent is not evidence. It is merely introductory ; as a part of a conversation which is material, it may be stated, but in itself it is nothing.
What was said to the prisoner, even if had been with a view' to draw out a confession, was not a threat, nor a promise of favor, such as the law regards. It cannot be pretended that there was any threat; and an offer to increase the chance of a conviction and throw the prisoner upon executive clemency, is certainly not a promise of favor. It shall not be said to a person accused, that it will be better for him if he confesses, and worse for him if he does not confess. This is the extent of the rule. 2 Stark. Ev. 48. Making a confession must be represented to him as being for his personal benefit, not for the benefit of his friends. It must have regard to his own temporal punishment for the offence charged.
All the supposed encouragement applied solely to the point of the prisoner’s assenting to Joseph’s making a confession, and not to any confession of his own.
Dexter and Gardiner, contra. The principle in regard to confessions is, not that the party has a secret of his own which shall not be extorted from him, but that his statement, whether "t discloses a secret or not, must be made voluntarily, in order to be credible. It is said that Joseph’s confession was not the property of the prisoner. This is true ; but when asked to assent to Joseph’s confessing, his power to assent or dissent is his own property, and if he assents it implies his participation in the offence. The proposition made to him was, in its natural import, that Joseph had determined to confess, upon condition that the prisoner gave his assent; and to induce him to assent, the hope of pardon was held out to him. And if favor w-ould *512 result to him from consenting that Joseph should confess, well might he suppose that his chance would be still better if he made admissions himself.
Morton J.
The general question presented and on which we have maturely deliberated, is, whether certain confessions of the prisoner are admissible in' evidence. We know not what they are, but presume them to be important. As the question does not depend upon authorities, but upon general principles, I think we have had all the light of which the case is susceptible, and we are ready to declare our opinions.
The general principle is well settled, that the confessions of parties in civil suits or criminal prosecutions) are to be received in evidence. It is equally clear, that confessions made under some circumstances are not admissible. Where they are entirely voluntary, they are to be received ; but where they are drawn out by any expectation of favor or by menaces, they are to be rejected. The question is, whether the facts before us show a case within the exception to the general rule ; in other words, whether the confessions were voluntary or not.
In determining this question, it is proper to take into view the reason on which confessions so drawn out are excluded. It is not because of any breach of good faith in admitting-them, nor because they are extorted illegally, (though there may be cases in which this would exclude them, as where a magistrate puts the accused upon his oath,) but the reason is, that in the agitation of mind in which the party charged is supposed to be, he is liable to be influenced, by the hope of advantage or fear of injury, to state things which are not true.
In this connexion it may not be improper to state, that this influence, which is to exclude the party’s confessions, must be external influence, and not the mere operations of his own mind. It may be that his own reasonings may induce him to think that he will derive advantage from a confession, and he may thus be led to state things which are untrue, but there can be no evidence of that fact. Cases have happened, where men have been convicted on their confessions which were false, or have been acquitted against their confessions. In Hall's case the prisoner’s own motives excluded his admissions. He had asked whether he might become a witness for the crown *513 and the evidence of this was rejected, on the ground that he hoped for favor. Whether the point would be so ruled in this Commonwealth, it is not necessary to consider.
A question was made, whether the inducement must be of a personal nature. It may be supposed that a desire to benefit a child or other near relation, may hold out as strong an inducement to falsify, as where the advantage contemplated is entirely personal. And there is one case reported, where an innocent person was tried for his life, having made admissions against himself in order to screen his brother. Though this should seem to come within the reason of the exception, I do not find it in the books, and I am not disposed to extend the exception. Indeed I have sometimes doubted whether confessions, with the accompanying circumstances, ought not always to be received in evidence ; but the law is settled otherwise. So far as relates to this point, I consider the argument sound, that the advantage expected must be personal.
With respect to the assent of the prisoner, if it were requested in relation to an immaterial fact, not implying any guilt on his part, any subsequent statements by him would not be excluded. But the question here is, first, whether the assent of Francis to Joseph’s making a confession, would be evidence against Francis. This would depend upon the circumstances. If Francis were told what Joseph had confessed, his assent might or might not implicate himself, according to the facts stated by Joseph. But if he were told that Joseph would confess, without being told what the conféssion would be, and he were requested to assent to the making of the confession, his assent or dissent would be evidence against him ; his silence even might be urged against him, as he would naturally inquire what the confessions were to be, unless he already knew. In the present case we must take the facts as they have been disclosed by the witness. He and Phippen Knapp having gone to the cell of Francis, Phippen says, “Well, Frank, Joseph has determined to make a confession, and we want your consent.” Francis answers, that it is hard, or not fair, that Joseph should have the advantage of making a confession, when this thing was done for his benefit. Phippen then tells him, that “if Joseph is convicted, there will be no chance for him (Jo *514 seph), but that if he (Francis) is convicted, he may have some chance for procuring a pardon.” If the assent of Francis was voluntary, we could not reject the evidence of it, and the question is, whether it was or was not voluntary. Whether this assent would affect the prisoner, is immaterial as respects the present question. The conversation was upon an understanding on the part of the prisoner and of the witness, that the prisoner was required to assent to an arrangement which would involve him in a conviction for a capital crime, and that his only chance rested on the hope of procuring a pardon. Whether he was mistaken or not as to the legal effect of the woids, still the influence would be the same. I think therefore the assent would be evidence against the piisoner, and so ought not to be admitted ; and any declaration made afterwards, on the understanding that he had consented to a confession, must be considered as made under the same influence.
It is argued, however, that the confession was voluntary, for though he was told he would have a chance for a pardon, yet that was proposed as an independent fact for his consideration, and not as a condition. But the question is, how was it understood ? If the remark was made not in a form to influence him, it would not exclude his confessions. It is necessary to attend to the circumstances. The prisoner is told that Joseph . is about to confess, and he is asked to give his consent. He then states his reasons why he should not consent. It is argued, that whether he consented or not, was immaterial. As to Joseph’s right to become a witness for the government, this is true ; and it is also true, that Joseph’s confessions would not be evidence against the prisoner; but the witness and Phippen went to his cell to obtain his consent. It may be that Joseph would not confess without. The reasons however are immaterial. It is enough that his consent was wanted. It was not stated to him that Joseph had confessed, but that he had determined to confess. The witness and Phippen thought the prisoner’s consent important, and so did the prisoner, as he gave his reasons for refusing it. Phippen then said, if Joseph should be convicted, he had no chance, but that if the prisoner was convicted, he had some chance of being pardoned. There can be no doubt but that this was said for the purpose of pro *515 curing his assent, and the hope of pardon was held out to him. This must exclude the evidence. The form of the words is immaterial. The question is, was the prisoner influenced. He hesitated, until an inducement was held out. An inducement which may operate is sufficient to exclude a confession, but here it appears the encouragement did influence the prisoner, for before it was offered he refused his assent and afterwards he gave it.
The former decision of the Court I think was right, and the evidence ought not to be admitted.
Wilde J. This is an important question in an important cause, and if the established principles of law, as applied to the facts in the case, will not sustain our former decision, we certainly shall be very ready and desirous to set it right; but after the utmost attention and deliberation, I cannot say that I entertain any doubt as to the correctness of the decision.
The material facts are, that the prisoner was informed by his brother Phippen, that Joseph had concluded to confess, and that he wished to procure the prisoner’s consent ; which Phippen advised him to yield ; encouraging him with the hope of a pardon, if he should be convicted. The question is, whether, after such encouragement, the consent of the prisoner to this arrangement can be given in evidence against him.
The general rule is, that all voluntary confessions made by a person charged with an offence, may be given in evidence against him. This, however, is a very doubtful species of evidence, and is to be admitted with great caution. Hasty confessions may be easily extorted by threats or promises from a person accused of a crime, when in a state of agitation and alarm and therefore all such confessions are excluded from the consideration of the jury. The slightest influence, say the books, is sufficient to exclude them.
Then was there any influence used by Phippen, to draw from the prisoner his consent to the plan proposed ? This, it appears to me, cannot be doubted. The object of the visit to the prisoner’s cell was, to procure his consent. The hope of pardon was held out to him for the purpose of influencing him, and it must be presumed that it did influence him, for at first he objected to the proposal made.
*516 But it has been argued, (and this is the principal argument,) thgj consent of the prisoner to Joseph’s confession does ( not amount to an admission of his own guilt, and has no tendency to prove it. I admit that the assent of the prisoner to the proposal of Phippen was not strictly speaking a confession, nor a direct admission of his own guilt; but in relation to the rules of evidence I think it equivalent. Taken in connexion with the previous conversation and circumstances stated by the witness, it would be evidence, and strong evidence, against the prisoner. It might be forcibly urged to,the jury as an implied admission of his guilt. It would show his knowledge of the criminal transaction, and that he adopted a plan professedly founded on the supposition that he and Joseph were guilty of the charge against them. It is true that it would not show in what particular manner they participated in the guilt, whether as principals or accessories; but the question is not whether the evidence offered would be sufficient to convict the prisoner, or whether he made a full or partial confession ; for if his consent to Phippen’s proposal would be evidence against him, tending to establish his guilt, it cannot, as it seems to me, be admitted, without violating a well established rule of evidence.
The remaining question is, whether evidence of any subsequent confessions should be admitted. It said that these confessions were not procured by any improper influence or persuasion ; and that the prisoner was not even advised to confess. Still, however, if his assent to Phippen’s proposal be evidence against him, and is to be excluded, because it was improperly procured, then his subsequent confessions ought to be excluded also. The rule is, that when a confession has been improperly obtained, all subsequent confessions are inadmissible ; although they may have been made at different times, and to different persons ; for the presumption is, that they were made under the same influence, or in consequence of the former confession.
For these' reasons I am confirmed in my former opinion, that the evidence offered is wholly inadmissible.
Putnam J, The government offer to give the confessions of the prisoner in evidence. His counsel object, because, as they allege, it appears that those confessions were drawn from *517 him by exciting in his mind a hope of pardon, or that he was influenced by the terror and distress of mind, arising from the communications which were made to him, before he made the confessions ; and therefore they were not, in the sense of the law, voluntary confessions. It is not proposed by my learned brethren to introduce a new rule of evidence in the criminal law. The long and well established rule is recognized, viz. that the voluntary confession of the prisoner is one of the strongest proofs of guilt, but it is to be rejected if procured by any threat of harm, or promise of favor or benefit. The late lamented chief justice, upon the trial of Clarke for arson, in this county, nine years ago, observed for the whole Court, “ that evidence of confessions is to be received with great caution, yet when made and satisfactorily proved, they are the best species of evidence ; better than the direct testimony of one who should testify that he saw the accused set a lighted torch to the building. In the latter case, doubts may arise as to the identity of the person, or the intention with which he did the act, or of the veracity of the witness ; but in the case of a voluntary confession by one of sufficient intelligence to know the nature and consequences of his crime, no such doubt can exist.”
I propose now to consider, whether any promise of favor oi threat of harm, was made to the prisoner, which can reasonably be considered as influencing his mind to make the confession. If it was so, the law throws its protection around him and rejects the confessions ; if it was not so, the government have a right to the evidence. The Court is called upon to execute a well known and established rule of the law, and not to decide a matter of mere discretion. The witness, the Rev Henry Colman, has clearly and deliberately stated the conversation which passed between the prisoner and his brother N. Phippen Knapp and himself, at the interview, before the confessions were made, and the question now is, whether there was any promise of favor if the prisoner would confess himself, or any threat of harm if he would not confess himself, contained in that conversation. T can see neither threat nor promise, which has the least application to the question whether the prisoner himself would make any confession. The only *518 question proposed to him was whether he would assent to Joseph’s making a confession for himself (Joseph} These questions are as different, as are the personal identities of Joseph and the prisoner.
Let us consider the effect which was apparently produced in the mind of the prisoner from the disclosure and proposal c f his brother Phippen. He announced Joseph’s determination to confess. That had been taken without consultation wi'h. Francis. It was evidently Joseph’s affair. Francis must have seen, that it was not a measure which he could control. He could not compel Joseph to confess, if he were unwilling , he could not prevent Joseph from confessing, if he chose to confess. If indeed Francis knew that Joseph originally proposed the thing for his own benefit, it would indeed seem hard that he should have the advantage of becoming a witness for the State. Francis did réason in that way. He was in the full possession of his mind, and seemed unwilling to relinquish to Joseph the benefit of becoming a State’s witness. It must have been known that one only of them could be admitted to that privilege. When they desired Francis to assent to Joseph’s becoming the witness, it is clear that he must have given up his chance of being a witness himself. The proposal was, therefore, that Francis should assent to something which was personally disadvantageous. But it is said, there was the hope of a pardon held out to him if he. would consent that Joseph should confess, and that his youth and magnanimity and his being drawn in by Joseph to the criminal act, would recommend him to the mercy of the executive. The amount of this argument, after all, is, that Francis might have been induced to believe that it would be better for him, that Joseph should certainly escape, and that Francis should have only a chance of a pardon if he should be convicted, than that Francis should certainly escape by becoming a witness for the State. There was then no benefit proposed to him.
If the prisoner had granted the request of his brother Phippen, the fact would have been wholly immaterial upon this trial. Could the government have urged the jury to convict Francis, upon that fact ? Would it follow, that because Francis was willing Joseph should confess himself to he guilty, he *519 tliereby acknowledged his own guilt, or that any < onfession which Joseph should make would be true ? Such an inference is disclaimed by the counsel for the government. An inference quite as strong against the prisoner might be drawn from the fact that he refused to assent to Joseph’s confessing. It might be said, that the prisoner knew that the confession would criminate him. But the counsel for the government disclaim that inference also. The mere naked fact, that the prisoner assented to Joseph’s making confessions for himself, would be entirely irrelevant. Can any motive which was proposed to nim, wliicn occasioned his assent or dissent to an immaterial fact, relating wholly to his brother, be brought to bear upon, or considered as influencing his own confession ? I think not. The operation of his own confession would be, to corroborate the evidence which Joseph should give against him. It would have been, in effect, just as if he had pleaded guilty. JVo such proposal was made to him. It formed no part of the subject matter of the interview, that Francis should make confessions. It was confined wholly to confessions to be made by Joseph for himself, not for Francis. If the mere assent or dissent would justify an inference against the prisoner, the government would have the means of compelling the prisoner to accuse himself; to place him on both horns of a dilemma, nolens volens. If he assents that Joseph shall be a witness, he by implication will be supposed to admit the truth of his confession. If he refuses, it will be because he knew, that if it were admitted, it would prove his guilt. So whether he assents or dissents, his guilt would be inferred. This cannot be correct. The prisoner might well say and think, that Joseph might do and say what he pleased. This confession would not affect him (Francis) when he stood upon his deliverance. I am therefore unable to see any' reason known to the law, which authorizes the Court to reject the confessions of the prisoner. But my learned brethren have come to a different result, and the opinion of the Court is, that the confessions of me prisoner ai 5 rejected, for the reasons which my learned brethren have given.[1]
*520 After this decision, the counsel for the prosecution stated that the Court had misapprehended their views ; that they intended to prove, not that the prisoner assented to Joseph’s confessing, but that he did not give such assent.
Wilde J. and Morton J. The question has been argued upon the supposition that he did assent, and we have so considered it; but if no effect was produced by the proposition made to him, the evidence of his confessions is admissible. The question to the witness should be put in such form as not to draw out an answer that the prisoner did assent.
Upon this intimation the witness was asked if the prisoner refused to assent. The witness answered, that there was neither assent nor refusal.
Dexter. An assent is implied, if there was no direct refusal.
Wilde J. and Morton J. The witness says no assent was given or refused. The general rule is, that confessions are admissible, and it is for the prisoner to show that he comes within the exception. If it is left uncertain whether the exception applies, the evidence is to be admitted, and if it shall appear that the confessions ought to be excluded, the jury will be so instructed. As the evidence now stands, it is not sufficient to authorize the Court to say there was an assent; and the confessions therefore must be received.
The Attorney- General opened this cause, and he obtained leave of the Court that Webster might aid him in the management of it, and close on the part of the government. When the foregoing point of law respecting the admissibility of the prisoner’s confessions came on for argument the second time, it was stated that the Solicitor-General had prepared himself to argue the question. But the Court ruled, that the cause must be conducted, both in regard to matters of law and matters of fact, by two counsel only on the part of the government. See St. 1785, c. 23, § 2.
After the decision by which the confessions were ruled out, the witnéss was asked on the part of the government, whether any place was pointed out by the prisoner, where a weapon *521 might be found. The counsel for the prisoner admitted' that the witness might testify that he found a weapon in a particular place, but they contended that he should not state any confession of the prisoner on the subject. Phil. Ev. (1st Am. fed.) 83 ; 2 Stark. Ev. 50 ; Rex v. Warrickshall, Leach (3d ed.) 298. But the Court were clear, that it was competent to the government to prove, that the weapon was found in the place pointed out by the prisoner and in consequence of his direction.[1]
The counsel for the prisoner, in order to discredit the testimony of Palmer, a witness examined on the part of the government, produced the record of his conviction in the Court of Common Pleas in the State of Maine, for shop-breaking, with intent to steal. The counsel for the government faintly objected to its admission, it being evidence of a single act of misconduct on the part of the witness ; but the Court said it was clearly admissible to affect the witness’s credibility. See Commonwealth v. Green, 17 Mass. R. 527, 531, 549.[1]
The evidence in the case tended to prove that Richard Crowninshield alone entered the house of White and there perpetrated the murder, and that the prisoner was in a street about 300 feet distant from the house, aiding and abetting.
Dexter. Upon this evidence the prisoner cannot be convicted as a principal in the murder. A principal in the second degree, according to the law of England, is by our statutes an accessory before the fact, and cannot be tried until there has been a conviction of the principal in the first degree. In this Commonwealth, the crime of murder and the trial and punishment, depend entirely on our statutes ; which repeal the common law on this subject. The St. 1784, c. 44', entitled “an act against murder and manslaughter,” provides, “ that whosoever shall commit wilful murder, shall suffer the pains of death.”
The St. 1784, c. 65, entitled “an act against accessories to crimes and felonious assaulters,” enacts, in § 1, “that if any person shall aid, assist, abet, counsel, hire, command or pro- *522 lure any person to commit the crime of murder, &c. he is and ¿haJi be considered as an accessory before the fact to the principal offender or offenders, and being thereof convicted, shall suffer the like punishment as is by law assigned for the crime to the commission of which he shall be so accessory.” The words are “ any person,” nothing being said of his being present or absent. The enactment that he shall be considered as an accessory before the fact, implies that he shall not be put upon his trial before the principal is convicted. This prosecution is founded on St. 1804, c. 123, entitled “an act providing for the punishment of the crimes of murder, &c. and for the prevention thereof.” It enacts, “that if any person shall commit the crime of wilful murder, or shall be present, aiding and abetting in the commission of such crime, or not being present, shall have been accessory thereto before the fact, by counsel-ling, hiring or otherwise procuring the same to be done, every such offender, who in the Supreme Judicial Court shall be duly convicted of either of the felonies and offences aforesaid, shall suffer the punishment of death.” The St. 18G5, e. 88, entitled “an act to repeal divers laws respecting crimes and offences,” repeals the St. 1784, c. 44, but not the St. 1784, c. 65; and the clause which makes an abettor an accessory before the fact, is still in force, unless it is repealed by St. 1«04, c 123. We say it is not repealed by this statute, but is consistent with it. This statute provides that accessories in one mode, namely, by being present, aiding and abetting, and accessories in another mode, namely, by counselling, &tc. not ■being present, shall, upon being duly convicted, suffer death. A repeal by implication is not to be favored. Faw v. Mars-teller, 2 Cranch, 23 ; Fisher v. Blight, ibid. 386 ; United States v. Palmer, 3 Wheat. 631 ; United States v. Wiltberger, 5 Wheat. 96 ; 6 Dane’s Abr. 588 ; Russell on Crimes (Davis’s ed.) 30, 31 ; Procter v. New hall, 17 Mass. R. 92 ; United States v. One Case of Hair Pencils, 1 Paine, 400.
Morton (Attorney-General) said the St. 1784, c. 65, had. reference to persons who were aiding and abetting, not being present. The words aiding, abetting, assisting, though more usually applied to principals, are also applicable to accessories before the fact. But this statute is repealed by St 1804, c *523 123, which contains our whole law of murder. 6 Dane’s Abr. coo c on 588, 589.
Dexter. The words aiding and abetting are technical, and include more than accessories at common law. In Commonwealth v. Macomber, 3 Mass. R. 257, Parsons C. J. says, “ the words ‘ aiding and consenting in the commission of the offence ’ naturally include all thus aiding and consenting, whether present or absent.” To imply that the words being absent were undesignedly omitted in the statute of 1784, is departing widely from the strictness commonly observed in the construction of penal statutes.
Putnam J. delivered the opinion of the Court. By the most ancient common law, as it was generally understood, those persons only were considered as principals in murder, who actually killed the man, and those who were present, aiding and abetting, were considered as accessories. So that if he who gave the mortal blow were not convicted, he who was present and aiding, being only an accessory, could not be put upon his trial. But the law was otherwise settled in the reign of Henry IV. It was then adjudged, that he .who was present, aiding and abetting him who actually killed, was to be considered as actually killing, as much as if he himself had given the deadly blow. The law has been so understood from that time to the present, unless it has been altered by our legislature by St. 1784, c. 65, as has been contended by the counsel for the prisoner.
It is urged, that by the first section of that statute, the distinction previously existing between persons present, and persons not present, aiding and abetting the commission of the felony, was done away ; so that all persons, whether present or absent, who should only aid and abet another to commit murder or other felony, should be considered and taken to be accessories only, and have all the privileges of accessories, — one of which was, not to be compelled to answer before the principal offender should have been convicted.
As this point is of great importance in the case, the Court have examined it with care, and after much deliberation, are of opinion that the St. 1784, c. 65,[1] was not intended to alter *524 the common law as it then stood, but referred to /arsons aiding and abetting who were not present, who were then technically considered as accessories. The title of the act indicates its object. It was “ an act against accessories to crimes and felonious assaulters.” It did not purport to make any new description of the persons who should be considered as accessories, but to provide for the punishment of such offenders.
It is an established rule, that a statute is not to be construed so as to repeal the common law, unless the intent to alter it is clearly expressed. No such intention can be reasonably inferred from the language of these statutes. The words of the statute of 1784 describe accessories before and after the fact, and if it had been the intention of the legislature to restore the old distinction as to accessories at the fact, it would have described such offenders by apt words.
When technical words are used, they are to be understood in their technical sense and meaning, unless the contrary clearly appears. The object of this statute being to provide for the punishment of accessories, we must conclude that it related , only to accessories in the legal sense at the time of the passage of the act, and not to those who were in the eye of the law then regarded as principals. So that construing the statute of 1784, c. 65, by its own language, we do not think it can be understood as relating to persons present aiding and abetting in the commission of a felony.
And we think that the St. 1.804, c. 123, § 1, contains a legislative construction to the same effect. It seems to be very clear, that this statute regards persons present aiding, &c. as principals ; for otherwise persons present, and persons absent, would not have been separately described, those who were absent being considered as accessories. So that if the former statute had been doubtful, the doubt would have been removed by the latter; especially when it is considered that all the statutes upon the same subject are to be construed as one statute.
The jury not being able to agree upon a verdict, were discharged of the cause. The prisoner’s counsel then moved for a continuance, and in support of the motion they offered an affidavit of the prisoner himself, which stated the absence of a material witness and the facts to which he would testify. Web *525 »ter objected that a capital trial cannot be postponed on the affidavit of the prisoner, because he has so much at stake that his affidavit is not entitled to credit. Wilde J. said such affidavits had been received in other cases of great importance to the prisoner. [1] The counsel for the government then admitted that the witness would testify to the facts stated in the affidavit, and a new jury were empannelled to try the cause.
In the first trial the prisoner’s counsel moved that the jury might view the house where the murder was committed, and the ground in the vicinity, and the Attorney- General expressed his desire that the motion should be granted. But per Curiam. We refused such a request in another case, and it does not appear to us that a view is necessary. It is attended with many inconveniences. We know not what the jury may hear and what impressions may be made upon them while they are taking the view. The case should be decided by the evidence given in court.
Upon the second trial the jury themselves requested that they might be permitted to see the place of the murder, and the counsel on both sides expressed their desire that permission should be allowed. The prisoner likewise gave his consent. The Court granted the request, but with hesitation, because they said this course was without precedent, and if it should turn out to be incorrect, they had doubts whether they could hold the prisoner to his consent. The Court directed that no person should go vvilh the jury, except the officers having them in charge, and that no person should speak to them, under penalty of a contempt. Plans were exhibited and explained to the jury in court, and they were permitted to take them with them.[1]
In regard to presence, Dexter contended that to make a man a principal by aiding and abetting in a felony, he must be in such a situation at the moment when the crime is committed, that he can render actual and immediate assistance to the perpetrator ; and that he must be there by agreement, and with the intent to render such assistance.
Webster maintained that to constitute a presence, it is suffi *526 cient if the accomplice is in a place, either where he may t-en-. c¡er a;,j t0 (he perpetrator of the felony, or where the perpetrator supposes he may render aid. If they selected the place to afford assistance, whether it was well or ill chosen for that purpose is immaterial. The perpetrator would derive courage and confidence from the knowledge that his associate was in the place appointed.
He also urged, that when it is proved that several persons conspired to commit a murder, and that the crime has been perpetrated by them, and there is no evidence of a part being assigned to one of them which would make him an accessory, the law presumes that all of them were principals ; that if one goes out with the others, with the design of bearing some part in the transaction, and it does not appear that he acted as an accessory, he must be deemed a principal; that if the prisoner went out to bear some part in the murder, and the government prove that he went towards the place where it was committed, th‘e presumption is that he went near enough to answer the purpose in view, unless he rebuts the presumption by evidence to the contrary.
Putnam J., in behalf of the whole Court, instructed the jury as follows. There is no evidence that the prisoner gave the mortal blows with his own hand; but it is contended on the part of the government, that he was present, aiding and abetting the perpetrator, at the time when the crime was committed. We are therefore to. consider what facts are necessary to be proved to constitute him, who is aiding and abetting, to be a principal in the murder ; or, in other words, what, in the sense of the law, is meant by being present, aiding and abetting.
It is laid down in Foster’s Crown Law, 349, 350, Discourse 3, § 4, that “ when the law requireth the presence of the accomplice at the perpetration of the fact, in order to render him a principal, it doth not require a strict, actual, immediate presence, such a presence as would make him an eye or ear wit-' ness of what passeth. Several persons set out together, or in small parties, upon one common design, be it murder or other felony, or for any other purpose unlawful in itself, and each taketh the part assigned him ; some to commit the fact, others to watch at proper distances and stations to. prevent a surprise, *527 or to favor, if need be, the escape of those who are more immediately engaged. They are all, provided the fact be committed, in the eye of the law present at it ; for it was made a common cause with them, each man operated in his station at one and the same instant towards the same common end ; and the part each man took tended to give countenance, encouragement and protection to the whole gang, and to insure the success of their common enterprise.” In § 5, — “In order to render a person an accomplice and a principal in felony, he must be aiding and abetting at the fact, or ready to afford assistance, if necessary.” So, in 1 Hawkins’s P. C. c. 32, § 7, (7th ed.) being present in judgment of the law, is equivalent to being actually present, for, says Hawkins, “ the hope of their immediate assistance encourages and emboldens the murderer to commit the fact, which otherwise perhaps he would not have dared to do, and makes them guilty in the same degree [as principáis] as if they had actually stood by, with their swords drawn, ready to second the villany.” These principles have been fully recognized by the very learned and distinguished chief justice of the Supreme Court of the United States, in 4 Cranch, 492.
The person charged as a principal in the second degree must be present; and he must be aiding and abetting the murder. But if the abettor, at the time of the commission of the crime, were assenting to the murder, and in a situation where he might render some aid to the perpetrator, ready to give it if necessary, according to an appointment or agreement with him for that purpose, he would, in the judgment of the law, be present and aiding in the commission of the crime. It must therefore be proved, that the abettor was in a situation in which he might render his assistance, in some manner, to the commission of the offence. It must be proved, that he was in such a situation, by agreement with the perpetrator of the crime, or with his previous Knowledge, consenting to the crime, and for the purpose of rendering aid and encouragement in the commission of it. It must also be proved, that he was actually aiding and abetting the perpetrator at the time of the murder. But if the abettor were consenting to the murder, and in a situation in which he might render any aid, by arrangement with *528 the perpetrator, for the purpose of aiding and assisting him in the murder, — then it would follow as a necessary legal inference, that he was actually aiding and abetting at the commission of the crime. For the presence of the abettor under such circumstances, must encourage and embolden the perpetrator to do the deed, by giving him hopes of immediate assistance ; and this would in law be considered as actually aiding and abetting him, although no further assistance should be given. For it is clear, that if a person is present aiding and consenting to a murder or other felony, that alone is sufficient to charge him as a principal in the crime. And we have seen that the presence by construction or judgment of the law, is in this respect equivalent to actual presence.
We do not however assent to the position which' has been taken by the counsel for the government, that if it should be proved that the prisoner conspired with others to procure the murder to be committed, it follows as a legal presumption, that the prisoner aided in the actual perpetration of the crime unless he can show the contrary to the jury. The fact of the conspiracy being proved against the prisoner, is to be weighed as evidence in the case having a tendency to prove that the prisoner aided, but it is not in itself to be taken as a legal presumption of his having aided unless disproved by him. It is a question of evidence for the consideration of the jury.
If, however, the jury should be of opinion, that the prisoner was one of the conspirators, and in a situation in which he might have given some aid to the perpetrator at the time of the murder, then it would follow, as a legal presumption, that he was there to carry into effect the concerted crime, and it would be for the prisoner to rebut that presumption, by showing to the jury that he was there for another purpose unconnected with the conspiracy. We are all of opinion that these are the principles of the law applicable to the case upon trial.

 See Roscoe’s Dig Grim. Ev. 28 et seq.; 1 Chitty on Grim Law, (3d Am. ea.) 570 et seq. and notes; Phillips's case, 1 Moody’s C. C. 271; Moore v. *520 Commonwealth, 2 Leigh, 701; State v. Guild, 5 Halsted, 163; Stages’s (ase, 5 Rogers’s Rec. 177; Batturs v. Sellers, 5 Har. & Johns. 117.

 See State v. Crank, 2 Bailey, 67; Jacfcsons case, 1 Rogers’s Rec. 28, Stages's case, 5 Rogers’s Rec. 177; Roscoe’s Dig. Crim. Ev. 36 et seq.; 1 Chitty on Crim. Law, (3d Am. ed.) 571, 572.

 Confirmed in Revised Stat. c. 94, ^ 56.

 See Revised Stat. c. 133, § 1.

 See State v. Morris, 1 Overton, 220; State v. Zellers, 2 Halsted, 220.

 The Court may order a view by any jury empannelled to try a criminal case. Revised Stat. c. 137, § 10.